**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x
**PHILLIP THOMPSON,**                                                    **Index No.: 1:23-cv-04155**

                                    **Plaintiff,**

            **-against -**


**SHUTTERSTOCK, INC., HEIDI GARFIELD,**
**SARA BIRMINGHAM, ANDRE GRAHAM**
**AND LEIA LEFAY,**

                                    **Defendants.**
-------------------------------------------------------------------------x


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' PARTIAL MOTION TO DISMISS THE AMENDED COMPLAINT**


**GODDARD LAW PLLC**
**39 Broadway, Suite 1540**
**New York, New York 10006**

**Attorneys for Plaintiff**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................iii-vi

I. PRELIMINARY STATEMENT ......................................................1

II. STATEMENT OF RELEVANT FACTS ........................................1

    a.  Plaintiff Suffers a Hostile Work Environment and Disparate Treatment ..........1

    b.  Black Employees Form an ERG, "ShADEs" in Response to the
        Discrimination..........................................................................2

    c.  Plaintiff Objects to and Reports Discrimination ................................3

    d.  Shutterstock Retaliatorily Paints Plaintiff's Efforts to Report Discrimination
        as Angry, Unproductive and an Attempt to Embarrass the Company ..............3

    e.  Plaintiff Reports Discrimination and Retaliation Again ....................4

    f.  Plaintiff Suffers Further Discrimination and Retaliation....................5

    g.  Plaintiff's Remote Accommodation is Taken Away When He Continues to
        Object to Race Discrimination.............................................5

    h.  Plaintiff is Warned to Leave When he Continues to Object,
        and Finally Leaves ......................................................6

III. ARGUMENT ......................................................................6

    a.  Plaintiff Has Properly Plead a Race-Based Hostile Work Environment and
        Disparate Treatment under § 1981, NYSHRL and NYCHRL ........................7

        i. Plaintiff Suffered a Racially Hostile Work Environment........................9

        ii. Shutterstock's Bias Against Black Employees Also Created a Hostile
        Work Environment................................................................11

        iii. Plaintiff Pled But for Causation............................................12

    b.  Plaintiff has Properly Pled Retaliation............................................12

        i. Plaintiff has Properly Pled Retaliation Claims Under
        NYSHRL and NYCHRL ..........................................................12

i

ii. Plaintiff has properly Pled Retaliation Claims Under § 1981 ..............14

iii. Plaintiff has Properly Pled Constructive Discharge ...........................15

c. Plaintiff Has Properly Pled Discrimination and Retaliation Against
the Individual Defendants ................................................................................18

d. Plaintiff has Properly Pled Aiding and Abetting Claims Against the Individual
Defendants Under NYSHRL and NYCHRL .....................................................19

e. Plaintiff Has Properly Pled an Unequal Pay Claims Against Defendant
Shutterstock..........................................................................................................20

IV. CONCLUSION ..............................................................................................................21

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page**

*Amaya v. Ballyshear LLC*,
    295 F. Supp. 3d 204 (E.D.N.Y. 2018) ....................................................................14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................................6

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).....................................................................................................7

*Brown v. City of Oneonta*,
    221 F.3d 329 (2d Cir. 1999) ......................................................................................8

*Burlington Indus*. v. *Ellerth*,
    524 U.S. at 753 S.Ct. 2257 ..................................................................................10,12

*Chertkova v. Conn. Gen. Life Ins. Co.*,
    92 F.3d 81 (2d Cir. 1996)..........................................................................................15

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
    140 S. Ct. 1009 (2020).................................................................................................9

*DeCintio v. Westchester County Med. Ctr.*,
    821 F.2d 111 (2d Cir.1987)........................................................................................15

*Distasio v. Perkin Elmer Co.*,
    157 F.3d 55 (2d Cir. 1998)........................................................................................17

*E.E.O.C. v. Farmer Bros. Co.*,
    31 F.3d 891 (9th Cir.1994) .......................................................................................10

*Energy Intelligence Grp., Inc. v. Scotia Capital (USA), Inc*.,
    Civ. No. 16-cv-617, 2017 WL 432805 (S.D.N.Y. Jan. 30, 2017) ...........................7

*Fincher v. Depository Tr. & Clearing Corp*.,
    604 F.3d 712 (2d Cir. 2010) ......................................................................................8

*Goins v. Bridgeport Hosp*.,
    555 F. App'x 70 (2d Cir. 2014) ................................................................................8

*Gregory v. Daly*,
    243 F.3d 687 (2d Cir.2001)...................................................................................10,13

*Henry v. NYC Health & Hosp. Corp.*,
    18 F. Supp. 3d 396 (S.D.N.Y. 2014)............................................................................8

*Hicks v. Baines*,
    593 F.3d 159 (2d Cir. 2010)......................................................................................14

*Hughes v. Xerox Corp.*,
    37 F. Supp. 3d 629 (W.D.N.Y. 2014) .......................................................................9

*Jute v. Hamilton Sundstrand Corp.*,
    420 F.3d 166 (2d Cir. 2005)......................................................................................14

*Kassman v KPMG LLP*,
    925 F. Supp. 2d 453 (S.D.N.Y. 2013)......................................................................20

*La Grande v. DeCrescente Distrib. Co.*,
    370 F. App'x 206 (2d Cir. 2010)  ..............................................................................15

*Littlejohn v City of New York*,
    795 F.3d 297 (2d Cir. 2015)..................................................................................8, 14

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)..................................................................................................14

*Meritor Savings Bank, FSB v. Vinson*,
    477 U.S. 57 (1986)....................................................................................................17

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
    715 F.3d 102 (2d Cir. 2013)........................................................................................9

*Motta v. Global Contract Servs., Inc.*,
    No. 15 Civ 8555, 2016 WL 2642229.........................................................................21

*Patane v. Clark*,
    508 F.3d 106 (2d Cir. 2007)........................................................................................8

*Patterson v. Cty. of Oneida, N.Y.*,
    375 F.3d 206 (2d Cir. 2004)........................................................................................8

*Petrosino v. Bell Atl.*,
    385 F.3d 210 (2d Cir.2004)........................................................................................16

*Pfeiffer v. Lewis County*,
    308 F. Supp. 2d 88 (N.D.N.Y. 2004)........................................................................20

*Pollis v. New School for Social Research*,
    132 F.3d 115, 118 (2d Cir. 1997)..........................................................................20

*Reid v. Ingerman*,
    876 F. Supp. 2d 176 (E.D.N.Y. 2012) ...............................................................20

*Ruotolo v. City of N.Y.*,
    514 F.3d 184 (2d Cir. 2008) ..................................................................................6

*Singhal v. Doughnut Planet,*
    No. 20-cv-3295, 2022 WL 976885 (S.D.N.Y. Mar 31, 2022)..............................20

*Solomon v. Fordham Univ. Admin.*,
    No. 22-887-cv, 2023 U.S. App. LEXIS 23494 (2d Cir. Sep. 5, 2023) .................21

*Sosa v. Medstaff, Inc.*,
    2013 U.S. Dist. LEXIS 175278 (S.D.N.Y. Dec. 12, 2013) ..................................19

*Talwar v. Staten Island University Hospital,*
    610 Fed. Appx. 28 (2d Cir. 2015)..........................................................................20

*Terry v Ashcroft*,
    336 F.3d 128 (2d Cir. 2003).....................................................................................16

*Treglia v. Town of Manlius*,
    313 F.3d 713 (2d Cir. 2002).....................................................................................15

*Tsirelman v. Daines*,
    794 F.3d 310 (2d Cir. 2015)......................................................................................6

*Vega v. Hempstead Union Free Sch. Dist.*,
    801 F.3d 72 (2d Cir. 2015).......................................................................................14

*Virola v. Xo Communs., Inc.*,
    No. 05-CV-5056 (JG) (RER), 2008 U.S. Dist. LEXIS 30413
    (E.D.N.Y. Apr. 15, 2008)........................................................................................19

*Walsh v New York City Hous. Auth.*,
    828 F3d 70 (2d Cir 2016)...........................................................................................7

*Wilkins v Time Warner Cable, Inc.*,
    10 F Supp 3d 299, 308 (NDNY 2014)....................................................................16

*Williams v. Metro-N. Commuter R. R. Co.*,
    2012 U.S. Dist. LEXIS 86631 (S.D.N.Y. June 20, 2012)........................................9

**<u>Statutes and Other Authorities</u>**

EEOC Policy Guidance on Employer Liability under Title VII
for Sexual Favoritism, N-915.048 (Jan. 12, 1990) ...........................................................11

New York City Administrative Code § 8-107 .................................................................1

New York State Human Rights Law § 296(h) .................................................................9

New York Labor Law Art. 6 §194 ..................................................................................20

## I.    PRELIMINARY STATEMENT

Plaintiff Phillip Thompson's former employers, Defendants Shutterstock, INC., Heidi Garfield, Andrea Graham and Sara Birmingham,[1] subjected him to race discrimination and retaliation based on his complaints about race discrimination in violation of Section 1981 of the Civil Rights Act, 42 U.S.C. § 1981. Defendants further subjected Plaintiff to discrimination and retaliation based on his race in violation of the New York State Human Rights Law, New York State Executive Law § 296 *et seq*. ("NYSHRL"); the New York City Human Rights Law, New York City Administrative Code § 8-107 *et seq*. ("NYCHRL"); and the New York Labor Law ("NYLL").  While Defendants cherry pick facts to avoid Plaintiff's fully plead allegations, the record shows that Defendants discriminated against Plaintiff in the terms and conditions of his employment, including, by subjecting him to a racially hostile work environment and racially disparate pay, and subjected him and other Black employees to discrimination and retaliation.

## II.    STATEMENT OF RELEVANT ALLEGATIONS

### a.   <u>Plaintiff Suffers a Hostile Work Environment and Disparate Treatment</u>

Shortly after Plaintiff was hired, he witnessed four of six Black employees in his section be inexplicably laid off while no white employees were laid off. Amended Complaint, filed on September 29, 2023 [Dkt. No. 33] (hereinafter "Amended Complaint") at ¶ 26. The four Black employees were replaced with non-Black employees.  *Id*. at ¶ 27.  Plaintiff was warned of a race issue at Shutterstock and told there was "no rational reason" for Shutterstock to lay off the four Black employees. *Id.* At ¶ 29.  Shutterstock's' Marketing and Editorial teams had no Black employees. *Id*. At ¶¶ 50, 51 and 70. Plaintiff's coworkers asked him about his "family in Africa"

---

[1] Plaintiff withdraws his claims against Individual Defendant Leia LeFay entirely and withdraws his NYLL Claims against all of the Individuals.

just because he is Black-though he has no family in Africa. *Id*. at ¶ 32. Shutterstock Employees routinely inappropriately discussed Plaintiff's hair, asking if it was "natural" and even touching it. *Id*. at ¶ 33.  Plaintiff began to wear a hat at work so that his coworkers could not touch his hair. *Id*. Shutterstock's library of images includes such racially offensive images as blackface which it refused to remove. *Id*. at ¶¶ 97-101. Black employees were accused of "congregating" and "reported" to Defendant Shutterstock for sitting together at lunch. *Id*. at ¶ 34.

  **b.  <u>Black Employees Form an ERG, "ShADEs" in Response to the Discrimination</u>**

   Approximately 40 Black employees (nearly all of Shutterstock's Black workforce) with concerns about anti-Black prejudice at Shutterstock started an employee resources group called ShADEs, an acronym for Shutterstock Afro-Descendants. *Id*. at ¶¶ 37-40. Disparately, Shutterstock required substantial amounts of Diversity, Equity and Inclusion work from ShADEs members but did not pay them for the work, though they had previously paid white employees for the same work. *Id*. at ¶¶ 42, 43, 50, 51 and 70. Following the murder of George Floyd, a Black individual in New York City, Shutterstock issued a public statement declaring that it would not tolerate racism and that it would take meaningful steps towards positive change in relation to race discrimination. *Id*. at ¶¶ 48 and 49.  Despite its performative statements, Shutterstock at no time took "meaningful steps towards positive change in relation to race discrimination." *Id*. at ¶¶ 21, 106, 109, and 116. Hypocritically, Defendant Shutterstock disparately began to require even more unpaid work related to its announced DEI efforts from its Black employees. *Id*. at ¶¶ 50 and 51. In fact, right after their new alleged commitment to fighting racism, Shutterstock failed to compensate three ShADEs members who worked on Shutterstock's George Floyd statement. *Id*. at ¶ 70. An HR Representative objected to Shutterstock's failure to compensate its Black employees and

requested that Shutterstock offer Restricted Stock Units to compensate ShADEs members as compensation for the unpaid work, but they did not do so. *Id*. at ¶¶ 70 and 71.

### c.  **Plaintiff Objects to and Reports Discrimination**

Plaintiff and his Black colleagues formally complained about racism at Shutterstock in June of 2020 by presenting a video Panel called a Seat at the Table. *Id*. at ¶¶ 52 and 53. Plaintiff and his colleagues reported the obstacles that they faced as Black employees, complained that they were being forced to do work related to Shutterstock's DEI efforts without compensation, and the racist microaggression that they suffered at Shutterstock. *Id*. at ¶¶ 54 and 55. Plaintiff specifically complained about being asked if he was visiting family in Africa, inappropriate comments about his hair and his hair being touched by white employees. *Id*. at ¶¶ 56, 32, and 33.

### d.  **Shutterstock Retaliatorily Paints Plaintiff's Efforts to Report Discrimination as Angry, Unproductive and an Attempt to Embarrass the Company**

Shutterstock, which normally makes all Employee Resource Group Presentations publicly available, refused to make "A Seat at the Table" publicly available.  *Id*. at ¶ 58. Shutterstock's top leadership, including its Chief Human Resources Officer and General Counsel, Defendant CHRO Garfield, smeared "A Seat at the Table" as angry and unproductive, stated that the DEI work ShADEs members were doing did not deserve compensation, and blamed ShADEs members complaints about uncompensated work on their own time management problems.  *Id*. at ¶¶ 59 and 60. Defendant CHRO Garfield also dismissed A Seat at the Table as merely an attempt to "embarrass" the company. *Id*. Shutterstock privately reprimanded CHRO Garfield for her comments but did not bother to tell Plaintiff that until his constructive termination. *Id*. at ¶ 115. Many members quit ShADEs after Shutterstock's negative reaction to A Seat at the Table for fear their membership in the Black employee resource group would be used against them. *Id*. at ¶ 63.

Plaintiff was warned via CHRO Garfield that he only escaped termination because he had not criticized anyone in leadership by name during A Seat at the Table. *Id*. at ¶ 64.

### e.  **Plaintiff Reports Discrimination and Retaliation Again**

Plaintiff reported retaliation to Human Resources Representative Wang in June of 2020. *Id*. at ¶ 65. HR Rep. Wang, commiserated with him, admitted pervasive discrimination at Shutterstock and sent his complaints-and her agreement with them-up Shutterstock's HR chain. *Id*. at ¶ 66. HR Rep. Wang told Plaintiff that her recommendations to pay Black employees for performing additional work to combat internal racism be compensated to no avail. *Id*. at ¶ 66. HR Rep. Wang called on Garfield, the head of HR, to take additional, necessary steps to ensure that Black employees could flourish at Shutterstock; questioned whether Shutterstock was allocating enough resources to its Black employees and whether Shutterstock was fostering healthy environments where Black employees could feel comfortable growing their careers; declared that the idea that Black employees themselves should be expected to shoulder the main burden of the company's stated DEI goals was "outrageous" and named "a distinct lack of diversity" as a key factor in Defendant Shutterstock's failure to match their public statements with their actions. *Id*. at ¶ 68. HR Rep. Wang reported her and Plaintiff's complaints of racism to Defendant CHRO Birmingham. *Id*. at ¶¶ 67-71. Wang indicated that the work ShADEs performed was "work we would typically hire (and pay for)" and "beyond planning events or networking," and said that "the failure to see this work as meaningful and driving the business forward in a manner that should be compensated speaks volumes as to how Black work is valued at Shutterstock – intentional or not." *Id*. at 70. In addition to being aware of but failing to act in response to "A Seat at the Table's" company-wide report of racial discrimination and inequity by Black employees, CHRO Birmingham repeatedly received but ignored and avoided complaints of the impact race

discrimination was having on Black employees, including Plaintiff who tried repeatedly to schedule meetings with her about a response to his complaints of racial discrimination. *Id*. at ¶¶ 67, 83, 92, 93, 94 and 108. Defendant Shutterstock HR repeatedly denied having knowledge of any complaint of race discrimination by Plaintiff. *Id*. at ¶¶ 88, 91, and 95 and 96. When he continued to push to meet with HR about his outstanding reports of discrimination and retaliation as set forth in A Seat at the Table, and then finally did meet with them to reiterate his complaints, his previously approved remote work accommodation was taken away from him just two weeks later. *Id*. at ¶¶ 88-105.

### f.   Plaintiff Suffers Further Discrimination and Retaliation

Meanwhile, Plaintiff's promotion path was severely delayed because of his race and because he objected to racism and spoke out at a Seat at the Table. *Id*. at ¶¶ 21, 22, 73 and 74. Despite receiving stellar reviews, Plaintiff suffered disparate treatment in that he was not promoted for three years, while a white member of his team was promoted five times. *Id*. at ¶¶ 73 and 74. Plaintiff was the first Black manager in his department and indeed one of only about 10 Black managers of Shutterstock's 235 employees.  *Id*. at ¶ 78. When he was finally promoted, however, he was given a disparate workload by Defendant Graham -indeed, he was forced to manage 25 employees instead of the 8 that his role called for. *Id*. at ¶ 77.

### g.   Plaintiff's Remote Accommodation is Taken Away When He Continues to Object to Race Discrimination

The racial discrimination and Retaliation continued for Plaintiff and repeatedly tried to schedule a meeting with Defendant CHRO Birmingham, who ignored him. *Id*. at ¶ 83.  Defendant Shutterstock denied having knowledge of any complaint of race discrimination by Plaintiff Id. at ¶¶ 88, 91, 95-96.  When he continued to push to meet with HR about his outstanding reports of discrimination and retaliation as set forth in A Seat at the Table, and then finally did meet with

them to reiterate his complaints, his previously approved remote work accommodation was taken away from him just two weeks later with no reasonable explanation. *Id.* at ¶¶ 88-105.

### h.  <u>**Plaintiff is Warned to Leave When he Continues to Object, and Finally Leaves**</u>

In late September of 2021 Plaintiff again complained, this time to Defendant Director Graham, that his complaints of racism and discrimination at Shutterstock had fallen on deaf ears and that the lack of progress was demoralizing. *Id*. at ¶ 106. In response, Defendant Graham told him that he should quit if he was unhappy. *Id*. at ¶ 107. In December of 2021, Plaintiff, intensely demoralized by Shutterstock's willful ignorance and complete refusal to investigate or act in any meaningful way in response to the allegations of race discrimination in the 20 months following "A Seat at the Table" despite his constant efforts to have his complaints addressed, and the discriminatory work environment resigned. *Id*. at ¶¶ 111-113. In response, HR told Plaintiff that while they were aware of his prior complaints, they did not know that HR had not "followed up" with Plaintiff about his race complaints. *Id*. at ¶ 114. Because of Defendant's knowledge of the racially hostile and discriminatory work environment and refusal to do anything about it, even when Plaintiff repeatedly complained, Defendant created an intolerable working condition, forcing Plaintiff to be constructively discharged. *Id.* at ¶¶ 111-114.

## III.       ARGUMENT

It is well-settled that when deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must assume the veracity of well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *See Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015); *Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008). To survive a motion to dismiss under Rule 12(b)(6), "an Amended Complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007)). *See also, Energy Intelligence Grp., Inc. v. Scotia Capital (USA), Inc*., Civ. No. 16-cv-617, 2017 WL 432805, at *1 (S.D.N.Y. Jan. 30, 2017). As such, the plaintiff must allege facts that "raise a right of relief above the speculative level on the assumption that all allegations in the Amended Complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56. The Second Circuit has emphasized the significance of viewing employment discrimination cases under a totality of the circumstance analysis. *Walsh v New York City Hous. Auth*., 828 F3d 70, 76 (2d Cir 2016). "No one piece of evidence need be sufficient, standing alone, to permit a rational finder of fact to infer that defendant's employment decision was more likely than not motivated in part by discrimination." *Id*.

### a. Plaintiff Has Properly Pled a Race-Based Hostile Work Environment and Disparate Treatment under § 1981, NYSHRL and NYCHRL

Plaintiff's Amended Complaint specifically alleges race discrimination based on a hostile work environment and disparate treatment. *See* Amended Complaint at ¶¶ 122, 123 and 126. Defendants do not seek to dismiss Plaintiff's Disparate Treatment claims, but inexplicably move to dismiss various facts that support his race claim by classifying them as a National Origin claim, an unequal pay claim and a failure to promote claim. *See* Defendant's Motion to Dismiss at Section II(A)-(C). Plaintiff alleges that he was treated disparately because of his race in that his co-workers assumed he has family in Africa because he is Black, coworkers touched his hair without his permission because he was Black, that he, as a Black man was forced to do diversity, inclusion and Equity work without compensation that white employees were paid to do, that he was promoted more slowly than white employees despite receiving stellar reviews, given three times as many direct reports when he finally was promoted, that he was the first Black manager in his department and indeed one of only about 10 Black managers of Shutterstock's 235 employees. *Supra* at Section II(a) and (f).

"To state a claim for a hostile work environment under ... § 1981, a plaintiff must show that the complained-of conduct: [i] is objectively severe or pervasive; [ii] creates an environment that the plaintiff himself subjectively perceives as hostile or abusive; and [iii] creates such an environment because of the plaintiff's race." *Goins v. Bridgeport Hosp.*, 555 F. App'x 70, 71-72 (2d Cir. 2014) (summary order) (citing *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007); *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 723-24 (2d Cir. 2010); see also *Littlejohn v City of New York*, 795 F.3d 297, 320-21 (2d Cir. 2015).

In evaluating "whether a plaintiff suffered a hostile work environment," a court "consider[s] the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Littlejohn*, 795 F.3d at 321. "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.*

Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 410 (S.D.N.Y. 2014) (quoting *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 224 (2d Cir. 2004)). To establish a claim under Section 1981, a plaintiff must allege: (1) that he or she is a member of a protected class; (2) the defendant's intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities. *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 1999). In addition, Plaintiff must show that "race

was a but-for cause of its injury." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014, (2020).

Under the NYSHRL, "[t]here are no 'bright-line rules' as to what constitutes an adverse employment action…" and the statute "'does not define adverse employment action solely in terms of job termination or reduced wages and benefits.'  As a result, 'courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" *Hughes v. Xerox Corp.*, 37 F. Supp. 3d 629, 641–42 (W.D.N.Y. 2014).  In 2019, the NYSHRL was amended, so that   a plaintiff need only allege "inferior terms, conditions or privileges of employment." *See* NYSHRL § 296(h).

Claims under NYCHRL  require only that a plaintiff allege "less well" treatment motivated from a protected characteristic. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013). Thus, a plaintiff must only "plead facts tending to show that actions that created the hostile work environment were taken against him *because of* a prohibited factor." *Williams v. Metro-N. Commuter R. R. Co.*, 2012 U.S. Dist. LEXIS 86631, at 34 (S.D.N.Y. June 20, 2012) (emphasis added).

i.    *Plaintiff Suffered a Racially Hostile Work Environment*

Here it is clear that Plaintiff was subjected to a severe and pervasive race based hostile work environment which included being subjected to microaggressions about his hair and ancestry, had his hair touched, was forced to do work without compensation that white employees were compensated for, witnessed highly racially disparate employment terminations, and was routinely denied meetings with HR, was not promoted despite stellar reviews while a white woman on his team was promoted 5 times, all while Defendants continually failed to follow up on his complaints of race discrimination. *Supra* Section (II)(a)(d) and (f).  Indeed, the environment was so racially

hostile that, after being accused of congregating, Plaintiff and almost every other Black employee formed an Employee Resource Group ("ERG") to address the racially hostile environment. *Supra* Section (II)(b). Defendant then used the ERG to assign Black employees DEI work for which they were not compensated, even though white employees were paid for such work. *Supra* Section (II)(b).  In response to Plaintiff and other Black employees' complaints of microaggressions, disparate pay and racism at Shutterstock, Plaintiff and his Black coworkers were labeled and dismissed as "angry," "unproductive" and lacking in time management-by the Chief Human Resources Officer. *Supra* Section (II)(d).  Defendants refused to post the Black employees' presentation, though they regularly posted other employee group's presentations. *Id*.

In response to Plaintiff complaints of racism and discrimination, his direct supervisor, Defendant Graham, warned him that he should "quit if he was unhappy." *Supra* Section (II)(d). Such comments indicating that accepting a discriminatory environment is integral to a job have been found to create a hostile work environment.  *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir.2001). ("Finally, by allegedly rejecting [Plaintiff's] complaints with the demand that she "get on board or quit," [the Supervisor] made it clear that his harassing conduct was anything but a joke, and that accepting it was something that [Plaintiff] should consider integral to h[is] job. Regardless of whether [the Supervisor] ultimately made decisions about tangible employment actions based on whether [Plaintiff] "got on board," threatening such a linkage can contribute to creation of a hostile work environment. See *Burlington Indus.,* 524 U.S. at 753, 118 S.Ct. 2257 (distinguishing between making threats and carrying them out));  *cf. E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 897–98 (9th Cir.1994) (noting that a woman "forced to tolerate […] harassing conduct for fear that her job or her advancement in the company are at risk ... may reasonably feel subordinated and belittled").

ii.   *Shutterstock's Bias Against Black Employees Also Created a Hostile Work Environment*

The EEOC has established that conduct that communicates a bias against protected class members creates a hostile work environment for them. *See* EEOC Policy Guidance on Employer Liability under Title VII for Sexual Favoritism, N-915.048 (Jan. 12, 1990), available at http://www.eeoc.gov/policy/docs/sexualfavor.html ("EEOC Policy Guidance"), at § C.  Plaintiff also alleged that Black employees were accused of "congregating" when they ate lunch together, that 4 out of 6 Black employees were inexplicably let go when no white employees were, that Shutterstock refused to remove racist images, that he was the first Black manager in his group and that out of 235 Shutterstock managers just ten were Black, and of course Shutterstock's anger at A Seat at the Table and refusal to act even after admitting race issues and hearing the complaints of its Black employees amount to the sort of conduct that could-and did-create a hostile work environment for its Black employees. *Supra* Section (II) (a-d and f).

Defendants' efforts to attack Plaintiff's allegations of racism as insignificant are easily rebuttable by the allegation that one of Shutterstock's own Human Resources Representative admitted the racism to Plaintiff and reported the internal race discrimination to Shutterstock.  *Supra* Section II(e).  Additionally, Shutterstock's own public statement following the murder of George Floyd acknowledged a race issue at Shutterstock, and a Seat at the Table confirmed it. Supra Section (II)(a-b).  Despite its performative statements, and the presentation by its Black employees about race issues at Shutterstock, Shutterstock at no time took "meaningful steps towards positive change in relation to race discrimination."

Since Plaintiff has properly plead a severe and pervasive hostile work environment, he has also properly plead that he was treated less well under the NYSHRL and the NYCHRL.

*iii.   Plaintiff Pled But For Causation*

As discussed supra, all adverse actions and the hostile work environment created by Defendant was only because of Plaintiff's race. Taking the pleadings as true, there are no other reasons but for Plaintiff's race that Defendant allowed employees to touch Plaintiff's hair, failed to promote Plaintiff at a rate equal with his non-Black peers, gave Plaintiff more work than his non-Black peers, and ultimately constructively discharged Plaintiff. Therefore, Plaintiff has met the but-for standard under section 1981. As Plaintiff has met the higher "but-for" standard, Plaintiff has met the lower NYSHRL and NYCHRL standards.

b.   **Plaintiff has Properly Pled Retaliation**

*i.   Plaintiff has Properly Pled Retaliation Claims Under NYSHRL and NYCHRL*

Though Defendant's motion to dismiss never bothers to mention it, a plaintiff states a retaliation claim under the NYCHRL and the NYSHRL when he alleges conduct that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington*, 548 U.S. at 54. Whether any particular conduct is retaliatory is a particularly fact-intensive inquiry. *Id.* at 69.

Here, Plaintiff alleges conduct that would, and indeed did, dissuade reasonable workers from making and supporting charges of racial discrimination within Shutterstock. Plaintiff repeatedly objected to the racially hostile work environment at Defendant Shutterstock, and he was repeatedly retaliated against for doing so. First, Plaintiff and his colleagues formally presented "A Seat at the Table," in which they reported that Black employees did not have "a Seat" at the Shutterstock "Table," due to such things as racist microaggressions and being forced to do DEI work that they were not compensated for. *Supra* Section (II)(c). In response to Plaintiff and other Black employees' complaints of microaggressions, disparate pay and racism at Shutterstock, Plaintiff

and his Black coworkers were labeled and dismissed as "angry," a well-known racist trope, "unproductive" and lacking in time management-by, of all people, the Chief Human Resources Officer. *Supra* Section (II)(d). Plaintiff was told he only escaped being fired in response to his role in A Seat at the Table because he had not named names-a dire warning to Plaintiff that he should not make reports of discrimination against individuals if he wanted to keep his job. *Id*. Plaintiff was not promoted despite stellar reviews while a white woman on his team was promoted 5 times-when he was promoted, he was given 25 employees to manage instead of the 8 required of his role. *Supra* Section (II)(f).

He then reported discrimination to Shutterstock HR Rep Wang, who commiserated with him, admitted pervasive discrimination at Shutterstock and sent his complaints-and her agreement with them-up Shutterstock's HR chain. *Supra* Section (II)(e).  When he continued to object to race discrimination and demand that his complaints be investigated, his previously approved remote accommodation was taken from him, just two weeks after he again asked for his complaints of discrimination to be addressed. Supra Section (II)(g). When he again complained about Shutterstock's failure to act, his Supervisor Defendant Graham, warned him he should quit if he was not happy. *Supra* Section (II)(h). Such threats support an inference of retaliatory animus. *Gregory v Daly*, 243 F. 3d 687, 701 (2d Cir. 2001).

Plaintiff became so demoralized by Shutterstock's failure to respond to his and other employees' complaints of race discrimination, except for telling him to quit if he was not happy, that his working conditions became so intolerable he was forced to give his notice. During his exit interview, when he again reported discrimination and retaliation and his frustration that his complaints were never followed up on, he was told that Shutterstock was "aware of" his prior complaints but didn't know that HR had not "followed up." *Supra* Section (II)(h).

It is clear that Plaintiff was subjected to treatment that would dissuade a reasonable person from objecting to race discrimination at Defendant Shutterstock. Indeed, reasonable workers WERE dissuaded as several members of ShADEs quit ShADEs after Shutterstock's Chief Human Resources Officer angrily denounced their complaints. *Supra* Section (II)(d).

> ii.  *Plaintiff has Properly Pled Retaliation Claims Under § 1981*

Retaliation claims under § 1981 "are evaluated under a three-step burden-shifting analysis.'" *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

To survive a motion to dismiss on a § 1981 retaliation claim, "a plaintiff must present evidence that shows '[i] participation in a protected activity; [ii] that the defendant knew of the protected activity; [iii] an adverse employment action; and [iv] a causal connection between the protected activity and the adverse employment action.'" *Littlejohn*, 795 F.3d at 315-16 (quoting *Hicks*, 593 F.3d at 164); *see also Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 226 (E.D.N.Y. 2018). As with other claims subject to the burden-shifting framework, "the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas*[.]" *Littlejohn*, 795 F.3d at 316. In other words, "for a retaliation claim to survive ... a motion to dismiss, the plaintiff must plausibly allege that: [i] Defendants discriminated — or took an adverse employment action — against [her], [ii] 'because' [she] has opposed any unlawful employment practice." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015). "[A] 'Plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as [s]he can establish that [s]he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the]

law.'" *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 212 (2d Cir. 2010) (summary order) (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). Defendants argue that Plaintiff has not satisfied the second and third prongs, but Plaintiff has plead several adverse actions-and a causal relationship between the adverse action and the protected activity. Most glaringly, (1) his involvement in "A Seat at the Table" was smeared by Chief Human Resources Officer Garfield as angry, unproductive and an effort to embarrassment to the company and he was told he was lucky he was not fired; 2) just two weeks after he again complained about the fact that HR still had not "followed up" on his complaints, Plaintiff's remote work accommodation which had been recently approved by HR and by his direct Supervisor, was taken away from him (*See* Section (II)(g), *Supra*); and 3) when he reported discrimination to his Direct Supervisor he was told to quit if he was not happy. *Supra* Section (II)(h). These actions, occurring directly after he complaints of race discrimination, all lead to an inference that a causal relationship exists between the actions and Plaintiff's complaint.

### iii.  Plaintiff has Properly Pled Constructive Discharge

The "true test in determining whether an employee was constructively discharged involves a cumulative investigation of the workplace." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir. 1996). To state constructive discharge, a Plaintiff must establish that the constructive discharge "occurred in circumstances giving rise to an inference of discrimination on the basis of [his] membership in [a protected] class." *Id*. at 91. Proof of such a causal connection "can be established 'directly through evidence of retaliatory animus directed against a plaintiff,' or 'indirectly by showing that the protected activity was followed closely by discriminatory treatment ... through other evidence such as disparate treatment of fellow employees who engaged in similar conduct.' *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.1987). "A plaintiff

may prove a constructive discharge by establishing that his employer, rather than acting directly, deliberately made his working conditions so intolerable that he was forced into an involuntary resignation, *i.e.*, so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Wilkins v Time Warner Cable, Inc*., 10 F Supp 3d 299, 308 (NDNY 2014)(internal quotation marks omitted). "An employee need not show that an employer acted with the specific intent to cause the employee to resign; rather, she need show only that the employer's actions were 'deliberate and not merely negligent or ineffective.'" *Id. quoting Petrosino v. Bell Atl*., 385 F.3d 210, 229–30 (2d Cir.2004). Comments by a Supervisor that indicate an employee is not wanted can allow a reasonable person to infer that he was not wanted as an employee and that he was going to be forced out of his employment. *Terry v Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003). Plaintiff came to work at Shutterstock and immediately experienced a racially hostile and disparate work environment. In an effort to right the ship, he helped form ShADES, an ERG for Black employees. Supra Section (II)(a) and (b). Plaintiff and other Black employees then spelled out the racial issues at Shutterstock for Shutterstock in a presentation called "A Seat at the Table." Supra Section (II)(c). Instead of giving its Black employees that proverbial Seat at the Table by taking action to correct the racially hostile environment, Shutterstock reacted with anger and utterly refused to act. Supra Section (II)(d). Other Black employees saw the writing on the wall and quit ShADEs for fear of retribution, but Plaintiff was determined to change the racist culture at Shutterstock, and he followed up on his complaints for more than twenty months before finally being told that he should quit if he was not happy. *Supra* Section (II)(d), (e), (g), and (h).  Defendants' refusal to address what it admitted was a racially hostile environment and instruction to Plaintiff to quit if he was not happy created an intolerable working condition where

it was clear that Defendants were deliberately acting in a way to cause Plaintiff to quit, resulting in a constructive discharge.

Shutterstock's argument that "According to the Complaint, each and every alleged complaint that Plaintiff made during his employment was investigated and addressed" is disingenuous at best. But the paragraphs Defendants reference, Amended Complaint ¶¶ 63-67, Plaintiff alleges that HR. Rep Wang's own report of discrimination and racially disparate pay, and Paragraphs 91, 94-96 discuss Shutterstock's refusal to honor Plaintiff's request that racist, highly offensive Blackface images be removed from the Shutterstock library.

In this Circuit, an employer who has notice of a discriminatorily abusive environment in the workplace has a duty to take reasonable steps to eliminate it*." Distasio v. Perkin Elmer Co.*, 157 F.3d 55, 65 (2d Cir. 1998). Plaintiff's allegations of racism and racially disparate pay, made in June of 2020, were never investigated as evidenced by the fact that Plaintiff was still begging Leadership to discuss the racism and disparate pay complained of in the "A Seat at the Table" throughout the Summer of 2021-a year and half later. *See* the Amended Complaint at ¶¶ 88-94. Plaintiff was repeatedly given the run around and told that there was no record of him complaining. *Id,* at ¶¶ 91 and 96. The Supreme Court has held that "Where a complainant without good reason bypassed an internal complaint procedure, she knew to be effective, a court may be reluctant to find constructive termination ...."  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 78 S. Ct. 2399 (1986). (Marshall, J., concurring in part and dissenting in part), and inherent in that decision is the reverse- where a complainant has tried so hard to utilize an internal complaint procedure and not been able to get anywhere, a Court should NOT be reluctant to find constructive termination. Plaintiff gave Shutterstock every opportunity to prove that it could curb the racist conduct and it refused. See Section (II)(a)-(h).

Plaintiff demonstrated the continual nature of the racially hostile work environment and Shutterstock's refusal to make any effort to address the situation or address racial pay disparity-even when a HR Representative reported discrimination and advised Shutterstock to fix the racially disparate pay problem. Shutterstock effectively forced the Plaintiff out of his position by refusing to address its own racist culture for more than 20 months and telling Plaintiff that if he was not happy with the racist culture, he should quit. *See* Section (II)(a)-(h).

### c. Plaintiff Has Properly Pled Discrimination and Retaliation Against the Individual Defendants

Defendant makes great effort to minimize the actions of the individual Defendants, but the allegations against Defendant Garfield, Defendant Birmingham and Defendant Graham establish that they participated in the discrimination and retaliation: Defendant Garfield, Shutterstock's Human Resources Leader and General Counsel, criticized a Seat at the Table as "angry," unproductive and meant to embarrass Shutterstock. See Section (II)(b). Garfield claimed that Black employees did not deserve compensation for the DEI work they performed and sent a message to Plaintiff stating the only reason he wasn't "immediately fired was because he had not specifically called out leaders by name; Shutterstock reprimanded Garfield for said comments. Supra Section (II)(d). Following her comments, many Black members quit SHADEs for fear that their membership in the ERG would be used against them. Id. Garfield, the head of HR, repeatedly refused to take action in response to reports of race discrimination and race based pay disparity, including when HR Rep Wang called on her, as Shutterstock's head of human resources, to take additional, necessary steps to ensure that Black employees could flourish at Shutterstock; questioned whether Shutterstock was allocating enough resources to its Black employees and whether Shutterstock was fostering healthy environments where Black employees could feel comfortable growing their careers; declared that the idea that Black employees themselves should

18

be expected to shoulder the main burden of the company's stated DEI goals was "outrageous" and that "a distinct lack of diversity" was a key factor in Defendant Shutterstock's failure to match their public statements with their actions. *Supra* Section II(d) and (e).

Defendant CHRO Birmingham, who replaced Defendant Garfield, continued to discriminate against Black employees be refusing to react to reports of discrimination or even meet with employees complaining of racism. Plaintiff alleges that, in addition to being aware of the "A Seat at the Table" a company-wide report of racial discrimination and inequity by Black employees that went unaddressed, CHRO Birmingham repeatedly received but ignored and avoided complaints of the impact race discrimination was having on Black employees including Plaintiff who tried repeatedly to schedule meetings with her, and HR Rep Wang. *Supra* Section II(e) and (g). Defendant Graham "asked" Plaintiff why he had not quit if he was so unhappy in response to Plaintiff's complaints of discrimination and Defendant Shutterstock's refusal to address his complaints of racism. Supra Section II(f). Plaintiff further alleges that Defendant Director Graham over assigned work to Plaintiff, including giving him 25 direct reports instead of the 5 he was supposed to have. *Id*.

### d. Plaintiff has Properly Pled Aiding and Abetting Claims Against the Individual Defendants Under NYSHRL and NYCHRL

Plaintiff has pled that the individual Defendants Graham, Birmingham and Garfield all "actually participated" in the conduct giving rise to the claim.[2] *Sosa v. Medstaff, Inc.*, 2013 U.S. Dist. LEXIS 175278 at 26 (S.D.N.Y. Dec. 12, 2013). An individual may be held liable for assisting another party in violating discrimination laws. *Virola v. Xo Communs., Inc.*, No. 05-CV-5056 (JG) (RER), 2008 U.S. Dist. LEXIS 30413 at 67 (E.D.N.Y. Apr. 15, 2008). As set forth in great detail above, Plaintiff alleges that Defendant Graham, Defendant Birmingham and Defendant Garfield

---

[2] Plaintiff withdraws any allegations indicating an aiding and abetting claim under § 1981.

all assisted Shutterstock in discriminating against him. *See Supra* Section II (a-h) and Section III(c). Defendant's reliance on *Singhal v. Doughnut Planet,* No. 20-cv-3295, 2022 WL 976885, at *5 (S.D.N.Y. Mar 31, 2022). and *Reid v. Ingerman*, 876 F. Supp. 2d 176, 186-187 (E.D.N.Y. 2012) is misplaced-there was no aiding and abetting on those cases because only one person was alleged to have acted unlawfully in those cases.

### e. Plaintiff Has Properly Pled an Unequal Pay Claim Against Defendant Shutterstock

Plaintiff's unequal pay claim properly meets the pleading standard and shows that Defendants paid Plaintiff less than his similarly situated white employees, including regarding potential promotions. Claims brought pursuant to Labor Law § 194, the New York Equal Pay Law, are analyzed under the same standards as the Federal Equal Pay Act. *Pfeiffer v. Lewis County*, 308 F. Supp. 2d 88 (N.D.N.Y. 2004). To establish claims under the Equal Pay Act, the plaintiff must demonstrate that "(1) the employer pays different wages to employees of the opposite sex [or race]; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions" *Talwar v. Staten Island University Hospital*, 610 Fed. Appx. 28 (2d Cir. 2015).  The New York Labor Law broadens the protected characteristics beyond gender to include race. N.Y.L.L. Art. 6 §194. Further, a plaintiff "need not demonstrate that her job is identical to a higher paid position, but only must show that the two positions are 'substantially equal' in skill, effort, and responsibility." *Kassman v KPMG LLP*, 925 F. Supp. 2d 453, 471 (S.D.N.Y. 2013). "[T]he fact that comparators of the opposite [protected category] had different job titles does not bar an EPA claim." *Id*.  Under the Equal Pay Act, proof of the employer's discriminatory intent is not necessary for the plaintiff to prevail on his claim. *See Pollis v. New School for Social Research*, 132 F.3d 115, 118 (2d Cir. 1997).

Plaintiff properly plead his prima facie case under the standard required by the New York Equal Pay Act. Plaintiff and other Black employees were required to do work for which they were not compensated but for which white employees were compensated. *Supra* Section (II)(b). Defendant Shutterstock's own Human Resources professional said it best in her own report of Discrimination at Shutterstock: Wang indicated that the work ShADEs performed was "work we would typically hire (and pay for)" and "beyond planning events or networking," and said that "the failure to see this work as meaningful and driving the business forward in a manner that should be compensated speaks volumes as to how Black work is valued at Shutterstock – intentional or not." *Supra* at Section II(e).  Plaintiff has alleged a New York Equal Pay Act claim.  Defendants' reliance on *Solomon v. Fordham Univ.*, No. 18 Civ. 4615 is erroneous as said case has been overturned on appeal. *Solomon v. Fordham Univ. Admin*., No. 22-887-cv, 2023 U.S. App. LEXIS 23494 (2d Cir. Sep. 5, 2023). Defendant's reliance on *Motta v. Global Contract Servs., Inc.*, is also inapplicable because the Plaintiff in that case failed to plead a "disparity" in treatment between members of a protected class and non-members. *Motta v. Global Contract Servs., Inc.*, No. 15 Civ 8555, 2016 WL 2642229, at *2. Indeed, the *Motta* complaint was dismissed because the Complaint did not allege that Plaintiffs were paid less than their white or male counterparts at the Call Center where they worked, whereas Plaintiff here has clearly pled his white counterparts were paid for work for which Plaintiff was not compensation. *Id.*

## III.   CONCLUSION

For all these reasons, the Court should deny Defendants' partial motion to dismiss Plaintiff's claims against Defendants.  In the event that the Court finds Plaintiff's allegations to be lacking, Plaintiff seeks leave to submit a Second Amended Complaint.

Dated: New York, New York
      November 10, 2023

                                                    GODDARD LAW PLLC
                                                    *Attorneys for Plaintiff*

                             By: */s/ Megan Goddard*

                                    Megan S. Goddard, Esq.
                                    39 Broadway, Suite 1540
                                    New York, NY 10006
                                    Tel: (646) 964-1178
                                    Fax: (212) 208-2914
                                    Email: Megan@goddardlawnyc.com

22