UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PHILLIP THOMPSON,

                         Plaintiff,

        -against-

SHUTTERSTOCK, INC., HEIDI GARFIELD,
SARA BIRMINGHAM, and ANDRE
GRAHAM,

                         Defendants.

23-CV-4155 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Plaintiff, a Black man, sues his former employer Shutterstock, Inc., and Shutterstock's employees for race discrimination and retaliation. Plaintiff claims that after he participated in an event organized by an employee resource group for Black employees, where participants criticized the racial climate at his company, he was saddled with unpaid labor and an excessive workload and denied approval to work remotely. Plaintiff also claims that he was frequently exposed to inappropriate racialized images, that his complaints were ignored, and that his supervisors made inappropriate racialized comments to and about him. According to Plaintiff, these were part of a larger culture of racial hostility.

Shutterstock and its employees move for summary judgment on all claims. Because Plaintiff has failed to put forth sufficient evidence of any discriminatory motive and has failed to offer admissible, non-hearsay evidence of allegedly racist comments, his claims cannot survive summary judgment. Shutterstock's motion is GRANTED.

## BACKGROUND

Defendant Shutterstock, Inc. ("Shutterstock" or the "Company") is a business that hosts an online contributor-sourced database of royalty-free images, photos, graphics, music, and other

media that customers can license for a fee. ECF No. 67 ("SMF") ¶ 9. Plaintiff Phillip Thompson, a Black man, was a Shutterstock employee from December 2017 through December 2021. *Id.* ¶¶ 1, 4.

## I.    Plaintiff's Initial Role and Involvement in ShADEs

Plaintiff began his work within the Company's Global Customer Care department ("GCC"). *Id.* ¶ 29. Plaintiff's first position was as a Customer Care Advocate ("CCA") for the Company's "Offset" library, a curated library that prioritizes high-end photography. *Id.* ¶¶ 29, 30. Plaintiff was responsible for handling various types of customer inquiries, although at the start of his employment, Plaintiff represents that he did not handle contributor-side interactions. ECF No. 59-2 ("Thompson Dep.") at 84:10–85:22. Prior to accepting Shutterstock's offer of employment, Plaintiff understood that he would occasionally be responsible for viewing content uploaded by contributors, as well as other job duties. SMF ¶ 34.

Early on during his employment at Shutterstock, Plaintiff claims that he experienced racially insensitive incidents at the hands of his coworkers, including having his hair touched and being asked if he was going to visit family when he stated he was going on vacation in Tanzania. *Id.* ¶ 181. Plaintiff's peers also reported an incident where a white employee had reported several Black employees for "congregating" when they ate lunch together in a conference room booked for mealtime. *Id.* ¶ 184. As a result, in mid-2019, Plaintiff became a founding member of the Shutterstock employee resource group ("ERG") ShADEs, which stands for "Shutterstock Afro-Descendants." *Id.* ¶ 43.

An ERG is an employee-led and employer-supported affinity group consisting of employees who identify in a similar manner or share similar needs, along with their allies and supporters. *Id.* ¶ 44. ShADEs, which was one of several ERGs at Shutterstock, was intended to

support Black employees. *Id.* ¶ 45. Plaintiff's membership in ShADEs was voluntary and for which additional compensation was not expected or received. *Id.* ¶¶ 46, 48. Plaintiff is unaware of any Shutterstock employee who received additional compensation beyond their regular rate of pay to perform diversity, equity, and inclusion ("DEI")-related work, or any ERG-related work. *Id.* ¶ 49.

Plaintiff undertook several projects as part of his membership in ShADEs, including planning events, preparing written material, assisting with video creation, and preparing a quote for the Associated Press regarding Shutterstock's decision to recognize Juneteenth as a permanent Company holiday. *Id.* ¶ 51. Members of Shutterstock's editorial, content, and social media teams occasionally invited Plaintiff and other ShADEs members to provide their opinions regarding public-facing content that Shutterstock prepared concerning the Black community. *Id.* ¶ 52. Shutterstock likewise invited input from other ERGs, with Chief People Officer Sara Birmingham testifying that Shutterstock invited input from its LBGTQIA ERG when implementing gender-neutral bathroom policies. *Id.* ¶ 56. Nonetheless, Plaintiff claims that the lack of Black employees in the Shutterstock teams led to ShADEs being disproportionately relied on. *Id.* ¶ 188. And Plaintiff would often perform requested tasks during his workday, at the expense of his actual work. *Id.* ¶ 189. However, Plaintiff represents that he was not forced to perform any tasks, and that he was able to refuse tasks that he found to be too time-consuming. Thompson Dep. at 139:2–11; 141:20–142:3. When Plaintiff did decline projects requested by virtue of his ShADEs membership, he faced no consequences from the Company. *Id.* at 143:17–144:2; 157:7–158:2.

II.    **A Seat at the Table and Alleged Inflammatory Comments by Heidi Garfield**

On March 1, 2020, Plaintiff assumed the role of Team Lead, Emerging Markets within GCC. SMF ¶ 63. In the same month, Shutterstock's offices closed due to the COVID-19 pandemic. *Id.* ¶ 66.

On July 28, 2020, Shutterstock broadcasted a virtual panel discussion called "A Seat at the Table: A Conversation with ShADEs" ("ASAT"). *Id.* ¶ 68. Shutterstock posted ASAT on its internal website for employees to view if they could not attend the presentation live. *Id.* ¶ 69. Plaintiff was one of the panelists. *Id.* ¶ 70. During ASAT, panelists discussed shared experiences as Black Americans and as Black employees at Shutterstock. *Id.* ¶ 71. Plaintiff and his colleagues expressed concerns about racist microaggressions. *Id.* ¶ 192. Plaintiff also expressed concern that ShADEs members were regularly being asked to provide input regarding Shutterstock's DEI-related initiatives and public-facing content without compensation. *Id.* ¶ 72.

According to Plaintiff, in August 2020, a fellow ShADEs member, Amber Nobles, told him that Heidi Garfield, Senior Vice President and General Counsel, had described the ASAT presentation as "angry," "unproductive," and an attempt to "embarrass" Shutterstock. *Id.* ¶ 77. Plaintiff represents that Nobles also expressed that if Plaintiff named the people who made the racist comments and engaged in the racist activity he described in ASAT, his job would be in jeopardy. *Id.* ¶ 195. Plaintiff also claims that Christina Wang, a junior Human Resources Business Partner, advised him that Garfield remarked, "if ShADEs work is interfering with one's day to day, they ought to get better time management." *Id.* ¶ 79; Thompson Dep. at 220:6–16. However, Plaintiff did not witness Garfield make the statements, and Garfield denies making them. SMF ¶ 81. There is also no deposition testimony from Wang that Garfield made these statements. Garfield testified that she took a number of actions to address DEI-related issues

around the time of ASAT, including collaborating with Shutterstock's DEI team to engage employees and amplify diverse voices. ECF No. 59-5 ("Garfield Dep.") at 60:18–64:23.

In or around August 2020, Plaintiff contacted Wang to discuss Shutterstock's response to ASAT. *Id.* ¶ 82. Plaintiff told Wang that he did not feel Shutterstock had meaningfully responded to the concerns raised during ASAT and relayed Noble's report about Garfield's comments. *Id.* ¶ 83. Wang then submitted an email on August 25, 2020 to her manager, reiterating and reporting Plaintiff's concerns. *Id.* ¶ 84. The email describes concerns relayed by "various members of ShADEs," and suggests that Shutterstock: (i) consider implementing more structure around how ShADEs' leadership committee is selected; (ii) consider increasing recognition of the "voluntary" work of ShADEs; (iii) consider recognizing "key contributors" of ShADEs through an award of Restricted Stock Units ("RSUs"); (iv) and consider a "dedicated effort" to address the inequities experienced by the Black community. *Id.* ¶¶ 86–87. Plaintiff agrees that this email accurately captures the concerns he relayed to Wang. *Id.* ¶ 89. In the same month, Plaintiff left the ShADEs group. *Id.* ¶ 91.

In September 2020, Shutterstock hired Defendant Sara Birmingham as its Chief Human Resources Officer. *Id.* ¶ 92. Birmingham convened a meeting with ShADEs to discuss their concerns, although by this time, Plaintiff was no longer a part of the group. *Id.* ¶¶ 95–96. According to Birmingham, Shutterstock subsequently implemented several of the recommendations from Wang's letter, including by issuing RSUs as a form of equity award for leadership participation in ERGs. ECF No. 59-4 ("Birmingham Dep.") at 76:11–77:11. Birmingham also represents that Shutterstock subsequently investigated the concerns raised at ASAT and her meeting with ShADEs, *see* Birmingham Dep. at 46:2–17, but Plaintiff states that he was not contacted and was not aware of any investigation. Thompson Dep. at 233:16–235:6.

Further testimony from Shutterstock's Head of Global People Operations, Max Iacocca, reflects that, while it was company policy to maintain a record for complaints and their investigation, Shutterstock lacked an actual system for maintaining these records. ECF No. 66-2 at 20:18–21:11.

After his 2020 annual performance review, Plaintiff received a merit-based increase in his salary. SMF ¶ 62. In January 2021, Shutterstock also featured Plaintiff in its Company-wide "Principles Spotlight," which highlights an employee's contributions to Shutterstock's core principles. *Id.* ¶ 75.

## III.    Plaintiff's Promotion to Manager, Contributor Servicing and Emerging Products

On March 1, 2021, Plaintiff was promoted to the position of Manager, Contributor Servicing and Emerging Products in GCC and received a salary increase. *Id.* ¶¶ 99–100. Plaintiff was the first employee to hold this title. *Id.* ¶ 101. Plaintiff states that previously, GCC managers had separately held the titles Emerging Product Manager and Contributor Manager. *See id.*; ECF No. 66-1 ¶¶ 6–7. In his new role, Plaintiff reported to Andre Graham, the Director of Customer Care in GCC. *Id.* ¶ 102. Plaintiff was responsible for, among other things, managing the GCC's Emerging Products team. *Id.* ¶ 107. Around this time, Shutterstock had engaged two companies, the Sutherland Group ("Sutherland") and Directly Inc. ("Directly"), to serve as a first line response for contributor inquiries. *Id.* ¶ 108. Graham and Denise Quaglia (Vice President of GCC) were ultimately responsible for managing Shutterstock's relationship with Sutherland and Directly. *Id.* ¶¶ 41, 112. Graham assigned responsibility to Plaintiff to oversee certain elements of Shutterstock's relationship with Directly, as well as certain elements of the contributor-facing side of Shutterstock's relationship with Sutherland. *Id.* ¶ 113. Sutherland and Directly remained

responsible for employing and supervising their own workers, including paying them, disciplining them, and reviewing their performance. *Id.* ¶ 116.

## IV.    Blackface Images in Shutterstock's Database

In early 2021, Shutterstock implemented a new Diversity and Inclusion review policy governing what types of content the Company deemed acceptable for inclusion in its database (the "Content Policy"). *Id.* ¶ 133. Among other things, the Content Policy prohibited contributors from posting or utilizing images or keywords that were objectionable, offensive, or portrayed "people of different backgrounds in a disrespectful way." *Id.* ¶ 135. Plaintiff represents that in April 2021, he viewed two images in Shutterstock's database featuring a white-appearing woman with her skin painted black, which were the subject of a customer complaint. *Id.* ¶ 142. Both images were removed from the Shutterstock library for violating the Content Policy's prohibition on blackface. *Id.* ¶ 143. At another time, Plaintiff encountered two other offensive images: (i) "an image of a vintage postcard featuring ten Black children with the title 'Ten Little N*****s'"; and (ii) "an image of a white performer in blackface with prominent facial piercings labeled 'The Savage'" from the Ducasse D'Ath festival in Belgium. *Id.* ¶ 144; ECF No. 59-27 at 38. Both images are classified in Shutterstock's database as editorial content, or content that "document[s] actual real-life events." SMF ¶ 145. Defendant represents that editorial content cannot be licensed for commercial use from the database. *Id.* ¶ 146. Plaintiff, however, notes that while editorial content is initially flagged as not cleared for commercial use, customers can obtain commercial rights under certain circumstances. ECF No. 66-1 ¶ 27.

On October 8, 2021, Plaintiff asked Shutterstock to provide training on the Content Policy, so that employees and agents could effectively respond to contributor inquiries about why certain content was rejected or removed. *Id.* ¶¶ 148–49. At some point, the training was delivered

to Sutherland contributor care agents, although Plaintiff objects that this training was not what he had envisioned. *Id.* ¶ 154.

## V.    Plaintiff Requests Remote Work and Is Denied

Throughout 2021, Shutterstock employees worked from home due to the COVID-19 pandemic. *Id.* ¶ 155. Shutterstock advised its employees that it would require most of them to return to work in the Company's physical offices in a hybrid role beginning in 2022. *Id.* ¶¶ 156–57. According to the Hybrid Workforce Policy ("HWP"), employees who worked in "[r]oles that [were] needed onsite for cross-team collaboration or onsite employee support" were designated as hybrid and were required to work part time in person. *Id.* ¶ 158. At the time HWP was introduced, Plaintiff's role was designated as hybrid. *Id.* ¶ 159. Plaintiff asked permission to relocate from New York City to Georgia (where Shutterstock did not have an office) and to work remotely on a full-time basis. *Id.* ¶ 160. This process required Plaintiff to obtain approval from a number of people. *Id.* ¶ 161. Following that process, Plaintiff sought approval from Graham, who did not have the unilateral authority to approve his request but invited Plaintiff to complete the appropriate paperwork. *Id.* ¶ 165.

In September 2021, Plaintiff met with Margarita Buffel (Shutterstock HR Business Partner) and Quaglia to discuss his remote work request. *Id.* ¶¶ 123, 167. Quaglia informed Plaintiff that she could not approve his request to work remotely on a permanent basis. *Id.* ¶ 168. However, because Quaglia valued Plaintiff's skills and abilities, she suggested the possibility of Plaintiff transitioning to another role that could be done remotely. *Id.* ¶ 169. Plaintiff asserts that he had no desire to switch to a new role nor had he expressed such a desire to anyone in his department or in HR, and that was because of a likely decrease in pay. Thompson Dep. at 418:20–419:20. Plaintiff was not told there would be a decrease in pay, but relied upon the HWP,

which stated that employees working in Georgia would be paid less than employees working in New York due to "pay zone" policies. *Id.* at 419:9–20.

## VI.    Plaintiff Attempts to Meet with Chief Human Resources Officer ("CHRO") Sara Birmingham

On August 4, 2021, Plaintiff contacted Birmingham to set up a meeting to discuss his concerns about Shutterstock's response to ASAT in July 2020. *Id.* ¶ 119. Birmingham responded that her assistant, Laura Ethington, would arrange a time to meet with him. *Id.* ¶ 120. It was Ethington's practice to refer employees to other members of Shutterstock's HR team when Birmingham's calendar was too full. *Id.* ¶ 121. Birmingham represents that when Plaintiff reached out in the summer of 2021, her calendar was heavily occupied. Birmingham Dep. at 86:7–17. Accordingly, on August 9, 2021, Ethington arranged for Plaintiff to meet with her and HR Business Partner Margarita Buffel. *Id.* ¶ 123.

During this meeting, Plaintiff discussed Garfield's comments and his reason for leaving ShADEs. *Id.* ¶ 206. According to Plaintiff, Ethington stated that Garfield was "reprimanded" for her comments, but Ethington did not indicate which comments she was referring to or whether she personally heard any comments or reprimands. Thompson Dep. at 222:3–223:12. Afterward, Ethington connected Plaintiff to the Global Head of DEI, Meeckel Beecher. SMF ¶¶ 98, 124–25. Beecher and Plaintiff had several discussions. *Id.* ¶¶ 126–27. Plaintiff states that he repeatedly asked both Ethington and Beecher to see files of any investigation that HR had done on his complaints. *Id.* ¶ 207. Beecher asked if Plaintiff had the file regarding his complaints, and when Plaintiff responded in the negative, Beecher said he would "see if they could find something." Thompson Dep. at 385:20–386:9. Plaintiff states that Beecher failed to address Plaintiff's concerns. *Id.* ¶¶ 126–27; Thompson Decl. ¶ 26. Beecher did invite Plaintiff to become more involved in Shutterstock's DEI initiatives, stating that Beecher was "understaffed," but Plaintiff

declined. *Id.* ¶ 132; Thompson Decl. ¶ 24. Plaintiff never followed up with Birmingham to arrange a meeting after August 4, 2021. SMF ¶ 128.

## VII.    Plaintiff's Meetings with Manager Andre Graham

Plaintiff asserts that he complained of race discrimination to Graham on multiple occasions, including about the blackface images, the inadequacy of the DEI policy, and treatment of Black employees. *Id.* ¶ 197; Thompson Dep. at 28:6–29:10. Plaintiff specifically claims that he spoke to Graham in September 2021 about his concerns. *Id.* at 388:6–10. During this conversation, Plaintiff discussed his frustration with being denied remote work, as well as general frustrations. *Id.* at 388:13–389:11. Within this conversation, Graham confessed that if he had to choose between his prior company and Shutterstock again, he would have stayed at his prior company. *Id.* at 389:4–11. Graham then asked Plaintiff why he was still at Shutterstock if he was so unhappy and nothing was changing. *Id.*; SMF ¶ 198.

Graham testified that he perceived many of these sessions to be "venting sessions about interpersonal interactions" between himself and two particular individuals, which he found to be "nonproductive." ECF No. 59-6 ("Graham Dep.") at 82:22–83:2. Graham would attempt to de-escalate conflicts so that the employees could work together and was successful on some occasions. *Id.* at 83:3–85:13. Plaintiff characterizes these comments as dismissing his complaints of a racially hostile work environment as "interpersonal issues" and "gripes." SMF ¶ 200.

## VIII.    Plaintiff's Departure from Shutterstock

On November 30, 2021, Plaintiff notified Shutterstock of his intention to voluntarily resign his employment at Shutterstock, effective December 10, 2021, to work as a Senior Account Manager of Commercial Sales at Great Bowery. *Id.* ¶ 173. Plaintiff had been applying for jobs outside of Shutterstock since at least February 2021. *Id.* ¶ 172. In Plaintiff's resignation

email, he explained that he was accepting this new position because it carried a significant increase in salary, a senior title, and the option to work remotely. *Id.* ¶ 174.

## IX.    Procedural History

On January 11, 2023, Plaintiff filed his complaint against Shutterstock, Birmingham, Garfield, Graham, and Leia LeFay in state court. ECF No. 1-1. Defendants removed this case to the Southern District of New York on May 19, 2023. ECF No. 1. Plaintiff filed his First Amended Complaint on September 29, 2023, bringing claims for race discrimination and retaliation in violation of 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"), as well as claims of race discrimination and retaliation and aiding and abetting discrimination and retaliation against individual defendants Graham, Birmingham, Garfield, and LeFay under the same laws. ECF No. 22 ¶¶ 121–46. Plaintiff additionally brought claims for unequal pay in violation of the New York State Equal Pay Act ("NYSEPA") against Shutterstock and for unpaid wages under the New York Labor Law ("NYLL") against all Defendants. *Id.* ¶¶ 147–58. Defendants moved to dismiss, which they renewed after Plaintiff filed the first amended complaint. ECF Nos. 20, 23.

On June 10, 2024, the Court granted the motion in part and denied in part, allowing Plaintiff leave to amend certain claims. ECF No. 32 ("MTD Op."). Because Plaintiff voluntarily withdrew all claims against Defendant LeFay, his NYLL claims for unequal pay and unpaid work against all the Individual Defendants, and any purported Section 1981 claim for aiding and abetting, these claims were dismissed. *Id.* at 59.

The Court further dismissed the following claims: Section 1981 claim for discrimination against Shutterstock, based upon failure to promote, excessive workload, denial of a remote work request, and constructive discharge; Section 1981 claims for discrimination and retaliation

against Graham; Section 1981 retaliation claim against Birmingham; NYCHRL and NYSHRL claims against Shutterstock for discrimination based upon a failure to promote, an excessive workload, and constructive discharge; same state law claims against Defendant Birmingham for direct retaliation and aiding and abetting retaliation; and finally, pay claim against Shutterstock under the NYSEPA. *Id.* at 59–60.

Plaintiff was permitted leave to amend to: (1) support his excessive workload claims by identifying similarly situated non-Black employees who did not receive an excessive workload; (2) support his hostile work environment claim by identifying the nature of the blackface images, and how often and in what manner he encountered them; (3) support his retaliation claims against Defendants Graham or Birmingham by identifying additional actions by Defendants Graham or Birmingham that deterred him from engaging in protected activity or by identifying a nexus between the existing allegations of retaliation by Defendants Graham or Birmingham and protected activity; and (4) support his NYSEPA claim by identifying similarly situated non-Black employees who received higher pay for engaging in the same work as Plaintiff. However, Plaintiff was not permitted to amend his (1) discrimination claim based on failure to promote; (2) section 1981 claim based on the denial of remote work request; and (3) the constructive discharge claim. *Id.* at 58–59.

On July 3, 2024, Plaintiff filed his Second Amended Complaint, the operative complaint. ECF No. 41 ("SAC"). The SAC contains the following claims, with the Court's permitted amendments: Section 1981 discrimination claims against Shutterstock, Birmingham, and Garfield; NYSHRL and NYCHRL race discrimination claims against all Defendants; Section 1981 retaliation claim against Shutterstock and Garfield; NYSHRL and NYCHRL retaliation claims against Shutterstock, Graham, and Garfield; aiding and abetting discrimination under the

NYSHRL and NYCHRL against Graham, Garfield, and Birmingham (the "Individual Defendants"); and aiding and abetting retaliation under the NYSHRL and NYCHRL against Graham and Garfield.

On February 20, 2025, Defendants moved for summary judgment. ECF No. 57. Plaintiff opposes. ECF No. 65.

## LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp.*, 477 U.S. at 22. If the movant meets its initial burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation omitted).

When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing "particular parts of materials in the record" to survive the summary judgment motion. Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "Only disputes over facts that might affect the outcome of the suit under the governing law" preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor

of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997)). "The function of the district court in considering [a] motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 166–67 (2d Cir. 2021) (internal quotation marks and citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (internal citation omitted).

## DISCUSSION

The Court examines Plaintiff's claims in the following order: First, Plaintiff's discrimination claims under Section 1981, the NYSHRL, and the NYCHRL; second, the hostile work environment claims under the same laws; third, the retaliation claims under the same laws; and finally, the aiding and abetting discrimination and retaliation claims under the NYSHRL and NYCHRL. Because Plaintiff has failed to come forward with admissible evidence sufficient to raise genuine issues of fact for trial, each claim is dismissed.

## I.    Race Discrimination Claims Against Shutterstock and Individual Defendants Are Dismissed

Plaintiff claims racial discrimination in violation of Section 1981, the NYSHRL, and the NYCHRL. He claims that he was paid less, required to do more work, and denied the ability to work remotely because of his race. Plaintiff also claims that Birmingham, Garfield, and Graham are individually liable for race discrimination. The Court first sets forth the legal framework before analyzing the three bases for Plaintiff's claims and then turning to the claims against the Individual Defendants.

14

### A. Legal Framework

Section 1981 claims are analyzed under the three-step burden-shifting scheme articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Knox v. CRC Mgmt. Co., LLC*, 134 F.4th 39, 47 (2d Cir. 2025). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. 411 U.S. at 802; *Johnson v. NYC Dep't of Educ.*, 633 F. App'x 42, 43 (2d Cir. 2016). Specifically, for a *prima facie* case of alleged disparate treatment, the plaintiff "must show: (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008).

If the plaintiff satisfies the initial burden, the burden shifts to the defendants to illustrate "some legitimate, non-discriminatory reason for its action." *Id.* (internal citation omitted). "If such a reason is provided, plaintiff may no longer rely on the presumption raised by the *prima facie* case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." *Id.* "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 66 (S.D.N.Y. 2016) (citing *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999)). "Courts evaluating the sufficiency of evidence on a motion for summary judgment must carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Id.* (cleaned up).

15

Under the NYCHRL and NYSHRL,[1] however, the inquiry is simplified. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013); *see Arazi v. Cohen Bros. Realty Corp.,* No. 10-CV-8837 (GHW), 2022 WL 912940, at *7 (S.D.N.Y. Mar. 28, 2022). While the *McDonnell Douglas* burden-shifting analysis still appears to apply, "the plaintiff need only show that [his] employer treated [him] less well, at least in part for a discriminatory reason." *Mihalik*, 715 F.3d at 110 n.8.

## B. Discriminatory Compensation

Plaintiff states that he and other members of ShADEs were asked to perform unpaid labor on official Shutterstock content, such as social media posts, videos, and public statements. ECF No. 65 ("Opp.") at 8–9. "Because unequal pay is a relative concept, the key inquiry is whether the plaintiff has adequate comparators who are similarly situated in all material respects." *Wheeler v. Praxair Surface Techs., Inc.*, 694 F. Supp. 3d 432, 459 (S.D.N.Y. 2023) (cleaned up). For this reason, and because Plaintiff alleged that at least five other non-Black employees had previously been paid for the same work that he performed, the Court permitted Plaintiff's

---

[1]    Some courts in this district have reviewed NYSHRL claims accruing after 2019 under the same standard as the NYCHRL. *See, e.g., Arazi v. Cohen Bros. Realty Corp.,* No. 10-CV-8837 (GHW), 2022 WL 912940, at *7 (S.D.N.Y. Mar. 28, 2022) (treating discrimination claim under NYSHRL and NYCHRL as analytically identical). Recent Second Circuit case law, however, has treated the Section 1981 and NYSHRL standards as the same, while noting the "more lenient" NYCHRL standard. *See Knox v. CRC Mgmt. Co., LLC*, 134 F.4th 39, 48–50 (2d Cir. 2025). That said, the distinctions among the three laws did not appear to matter much in *Knox*, and it did not appear necessary for the *Knox* Court to separate the three analyses. *Id.* Here, Defendants propose analyzing NYSHRL claims under the federal standard, *see* ECF No. 58 ("Mot.") at 10 n.19, but do not argue why that would be appropriate in light of legislation broadening the NYSHRL's reach. *See* MTD Op. at 52–53. In any case, neither standard would affect the outcome here. And neither party argues that NYCHRL and NYSHRL claims should be analyzed under different standards from each other. *See* Mot. at 19–21; Opp. at 15. Therefore, the Court proceeds by applying the more lenient NYCHRL standard to NYSHRL claims.

discrimination based on disparate pay to move past the motion to dismiss stage. MTD Op. at 16–17.

However, Plaintiff has not offered evidence sufficient to support his *prima facie* claim at the summary judgment stage. To be sure, it is undisputed that Plaintiff *did* perform unpaid work as a part of his membership in ShADEs, including planning events, preparing written material, assisting with video creation, and preparing a quote for the Associated Press regarding Shutterstock's decision to recognize Juneteenth as a permanent Company holiday. SMF ¶ 51. Several of these tasks were at the request of members of Shutterstock's editorial, content, and social media teams. *Id.* ¶ 52. And Plaintiff testified that these Shutterstock teams relied disproportionately on the voluntary work of ShADEs, resulting in Plaintiff often performing requested tasks during his workday. *Id.* ¶¶ 188–89.

But this is not sufficient to survive summary judgment for two reasons. First, it appears that Plaintiff was performing these additional tasks voluntarily in assistance of his coworkers. It is undisputed that his membership in ShADEs was voluntary. SMF ¶ 46. And in August 2020, Plaintiff left ShADEs without consequence. *See id.* ¶ 91. The evidence shows that his departure from ShADEs had no negative impact on his job duties or salary. To the contrary, after his 2020 annual performance review, Plaintiff received a merit-based increase in his salary. *Id.* ¶ 62. In January 2021, Shutterstock also featured Plaintiff in its Company-wide "Principles Spotlight," which highlights an employee's contributions to Shutterstock's core principles. *Id.* ¶ 75. Plaintiff has testified that even while he was a part of ShADEs, he was free to refuse any tasks. Thompson Dep. at 139:2–11; 141:20–142:3; 142:20–22 ("We were a resource group to employees and, as you mentioned, it was not forced, so we had the right to say no."). And when Plaintiff did decline ShADEs-related projects, he faced no disciplinary consequences from the Company. *Id.* at

143:17–144:2; 157:7–158:2. In other words, without comparators, it is not clear that Plaintiff was performing compensable work at all.

Second, Plaintiff does not offer appropriate comparators. "In the disparate pay context, a plaintiff typically must plead and prove comparators' relevant experience and length of employment in order to raise an inference of discrimination." *Harlow v. Molina Healthcare, Inc.*, 723 F. Supp. 3d 116, 128 (N.D.N.Y. 2024) (cleaned up) (citing *Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99, 118 (S.D.N.Y. 2020)). Plaintiff claims that five non-Black Shutterstock employees were paid for DEI-related work that he performed without compensation, but offers no details about what these tasks were. Thomspon Dep. at 167:2–178:3. Nor can Plaintiff describe the job responsibilities of these individuals, and whether their tasks were performed in a capacity that was similarly situated to him. *See id.* Based on Plaintiff's deposition, it appears that at least one of these individuals, a social media account manager, was being paid for DEI work because it was her primary job responsibility and that she sought Plaintiff's voluntary help to assist in her work. *Id.* at 167:17–171:7. But that is distinct from Plaintiff's position, where he is seeking additional compensation for DEI work beyond his regular rate of pay. Plaintiff is unaware of any Shutterstock employee who received additional compensation beyond their regular rate of pay to perform DEI-related work, or any ERG-related work. *Id.* ¶ 49.

Plaintiff points to the fact that Shutterstock eventually hired Meeckel Beecher to head DEI work, indicating the belief that the DEI work "previously shifted on the ShADEs members was worth compensating someone for." Opp. at 9. That may be true, but it does not help Plaintiff's claim for discriminatory compensation because Meeckel Beecher, a Black man hired for DEI work, is not similarly situated to Plaintiff and therefore not an appropriate comparator. Thompson Dep. at 250:18–23. To be similarly situated, Plaintiff needed to show that an

employee of *a different race* with similar experience, in a *similar position*—that is, one with responsibilities that does not inherently encompass DEI work—performing similar voluntary tasks, was compensated for that work. Plaintiff has not done that. As such, his discrimination claim based on discriminatory compensation does not survive summary judgment.

### C. Excessive Workload

Plaintiff claims that he was given an excessive workload based on his race. He claims that in his role as Manager, Contributor Servicing and Emerging Products, he was required to supervise more people than similarly situated white employees. He also claims that he was given an excessive workload because he and other Black employees were asked to take on disproportionate DEI work. Opp. at 9–10.

"[T]he assignment of an excessive workload as a result of discriminatory intent . . . can be an adverse employment action because it is more disruptive than a mere inconvenience or an alteration of job responsibilities[.]" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015) (cleaned up). Discriminatory intent "may often be inferred from the totality of the relevant facts[.]" *Washington v. Davis*, 426 U.S. 229, 242 (1976).

Plaintiff has not come forward with evidence to demonstrate a genuine issue of material fact as to this claim. As an initial matter, the Court is not convinced that Plaintiff has shown any proof he was even assigned an excessive workload. Regarding Plaintiff's argument that he was overworked as a ShADEs member, it is already established that his membership in ShADEs was voluntary, that he was free to decline any tasks, and that he left ShADEs without consequence in August 2020. SMF ¶¶ 46, 91; Thompson Dep. at 139:2–11; 141:20–142:3; 142:20–22.

As for his position as Manager, Contributor Servicing and Emerging Products, Plaintiff suggests an inference that he endured an excessive workload from the fact that his job title is a

combination of two roles previously held by two separate individuals. Opp. at 10. But there are many reasons titles can be merged, including inefficiency or a change in structures and processes. This fact alone is not enough to show excessive workload. Plaintiff does provide an overview of his duties, *see* SMF ¶¶ 102–116; Thompson Dep. at 110:13–112:18, but does not describe how these tasks practically amounted to an excessive workload. He does not describe his expected work hours or his actual work hours.

Instead, the basis of Plaintiff's claim that he was given an excessive workload in the Manager role is that his role "entailed the supervision of more people than similar[ly] situated employees." Opp. at 10. Specifically, that meant he was supervising employees from Sutherland and Directly, two companies that Shutterstock began a working relationship with around the time that Plaintiff's position was created. SMF ¶¶ 99–108. But his supervision duties appear, at least from his testimony, to be limited: Plaintiff did not have to discipline employees, approve vacation days, complete evaluations, or meet employees face to face. Thompson Dep. at 112:19–114:2. Neither could he recall the names of those employees, aside from three. *Id.* at 113:13–114:15. Instead, it is undisputed that Sutherland and Directly remained responsible for employing and supervising their own workers, including paying them, disciplining them, and reviewing their performance. *Id.* ¶ 116.

Even assuming Plaintiff had an excessive workload in his capacity as Manager, Contributor Servicing and Emerging Products, Plaintiff does not show that the assignment of this workload was based on his race. Plaintiff identifies no statements linking his promotion or his tasks to his race. Plaintiff argues that Mike Lucero, Jeff DeWaters, Francesca Bruno, and Jea Paz are comparators, in part because some held the separate titles of Emerging Product Manager or Contributor Manager (but not both), and in part because none were expected to "manage more

direct reports than [they were] officially responsible for." Opp. at 10; SAC ¶ 76. But this appears to be before Shutterstock contracted with Directly and Sutherland and outsourced work related to contributor management. *See* SMF ¶¶ 99–108. Moreover, Lucero, DeWaters, Bruno, and Paz held titles of higher seniority than Plaintiff, and none reported to Graham like Plaintiff. SMF ¶ 105; Graham Dep. at 25:6–9. In other words, it is not clear that the positions held by Lucero, DeWaters, Bruno, and Paz are comparable to Plaintiff's position. The evidence offered only gives rise to conjecture of discrimination. It does not allow for the reasonable inference that is required to withstand summary judgment, because "it is well established that a plaintiff must do more than cite to their mistreatment and ask the court to conclude that it must have been related to their race." *Nieblas-Love*, 165 F. Supp. 3d at 66 (cleaned up).

### D.  Denial of Remote Work

Plaintiff claims that Shutterstock discriminated against him by denying his request to work fully remotely in violation of the NYCHRL. Opp. at 11. The Court previously held that, construing all inferences in Plaintiff's favor, that Plaintiff's allegations about similarly situated white employees were sufficient to state a discrimination claim based on denial of remote work under the more lenient standards of the NYCHRL. MTD Op. at 44. But at the summary judgment stage, Plaintiff fails to come forward with evidence supporting his allegations.

A discrimination claim under the NYCHRL does not require showing of an adverse employment action—just that Plaintiff's employer treated him "less well, at least in part for a discriminatory reason." *Mihalik*, 715 F.3d at 110 n.8. Here, there is a dearth of evidence suggesting that Shutterstock denied Plaintiff's request for remote work in any part for a discriminatory reason. Shutterstock's Hybrid Workforce Policy stated that employees like Plaintiff, who worked in "[r]oles that [were] needed onsite for cross-team collaboration or onsite

employee support," were designated as hybrid and were required to work part time in person. SMF ¶¶ 158–59. There is no evidence that Shutterstock only enforced this policy with regard to Black employees like Plaintiff. To the contrary, Shutterstock represents that employees in Plaintiff's department assigned a hybrid role were regularly denied remote work requests. Graham Dep. at 125:21–126:6.

Fatally, Plaintiff lacks comparators to make his case. The only known members of Plaintiff's department who were approved for remote work requests were Grete Miller, who had no direct reports and eventually returned to in-person work; Alex Rodriguez, who had an immunocompromised child but eventually returned to in-person work; and Joey Krier, who worked in-office for another department in California. *Id.* at 126:7–129:7; Thompson Dep. at 19:11–15; ECF No. 60 ("Quaglia Decl.") ¶¶ 17–18. Plaintiff does not show that any of these three individuals performed duties like his or were in circumstances similar to his own. Plaintiff does represent that he had multiple direct reports who worked remotely, *see* Thompson Dep. at 408:19–409:2, but as a manager of those remote workers, the nature of his own role and the onsite demands would have differed. *See* Quaglia Decl. ¶ 12 ("Among other considerations, if an employee had direct reports, the employee's role was typically designated as hybrid.").

With the available evidence, the Court could only speculate about discriminatory intent. This is insufficient to overcome summary judgment.

### E. Individual Defendants

Plaintiff claims that Individual Defendants discriminated against him in violation of Section 1981, the NYSHRL, and the NYCHRL. "Under Section 1981, the NYSHRL, and the NYCHRL, individual liability exists only where a defendant actually participated in the conduct giving rise to a discrimination claim." *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp.

3d 51, 75–76 (S.D.N.Y. 2016) (cleaned up) (collecting cases). Negligence is not sufficient. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74–75 (2d Cir. 2000). And to establish supervisory liability against any individual Defendant, Plaintiff must show that the Defendant "should have known of the offending employee's unlawful discriminatory conduct yet failed to exercise reasonable diligence to prevent it." *Nieblas-Love,* 165 F. Supp. 3d at 78 (cleaned up). In other words, personal liability may be found for "not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004).

As an initial matter, Plaintiff has failed to show "conduct giving rise to a discrimination claim." *Nieblas-Love*, 165 F. Supp. 3d at 75–76; *see supra*, Discussion Section I(A)–(D). There cannot be individual liability where there is no underlying discriminatory conduct. *See id.* That said, even assuming there was any underlying discriminatory conduct, Plaintiff fails to show that the Individual Defendants are liable for the following reasons.

### 1. Birmingham

Plaintiff claims that Birmingham engaged in discrimination as a supervisor because she was aware of Plaintiff's complaints of race discrimination and failed to act. It appears undisputed that Birmingham held a supervisory role in regard to Plaintiff. *See* Mot. at 15–16. But the record does not show that Birmingham can be liable for "gross negligence" and "failure to take action" upon receiving information about discrimination occurring. *Patterson*, 375 F.3d at 229.

Two sets of events are relevant to this analysis. First are the events that occurred after ASAT in 2020. At that time, Plaintiff discussed his concerns of racial discrimination in relation to ASAT with Wang. SMF ¶ 82. Wang's email to her manager described these concerns and

suggested that Shutterstock: (i) consider implementing more structure around how ShADEs'

leadership committee is selected; (ii) consider increasing recognition of the "voluntary" work of

ShADEs; (iii) consider recognizing "key contributors" of ShADEs through an award of

Restricted Stock Units ("RSUs"); (iv) and consider a "dedicated effort" to address the inequities

experienced by the Black community. *Id.* ¶¶ 84, 87. Plaintiff agrees that this email accurately

captures the concerns he related to Wang. *Id.* ¶ 89.

Birmingham was hired in September 2020, shortly after ASAT and the related email, as

Chief Human Resources Officer. *Id.* ¶ 92. She met with ShADEs to discuss these concerns,

although by this time, Plaintiff was no longer a part of the group. *Id.* ¶¶ 95–96. In other words, it

is not clear that at this time, Birmingham had any knowledge of Plaintiff's complaints of

discrimination, aside from what was relayed in the Wang email and the ShADEs meeting.

In any case, according to Birmingham, Shutterstock subsequently implemented several of

the recommendations from Wang's letter, including by issuing RSUs as a form of equity award

for leadership participation in ERGs. Birmingham Dep. at 76:11–77:11. Plaintiff came forward

with no evidence to the contrary. Birmingham also represents that Shutterstock investigated the

concerns raised at ASAT and her meeting with ShADEs, *see* Birmingham Dep. at 46:2–17, but

Plaintiff states that he was not contacted and was not aware of any investigation. Thompson Dep.

at 233:16–235:6. While Plaintiff argues that the lack of documentation on an investigation means

there was no actual investigation, *see* SMF ¶¶ 212–14, that is not what the record suggests.

Deposition testimony from Shutterstock's Head of Global People Operations, Max Iacocca,

reflects that while it was company policy to maintain a record for complaints and their

investigation, Shutterstock lacked an actual system for maintaining these records. ECF No. 66-2

at 20:18–21:11. While this may not be a good practice, it does not demonstrate that the

investigation did not occur. It also does not and cannot give rise to liability for race discrimination, particularly where Plaintiff cannot establish what the underlying discrimination was and where Birmingham has testified both that she did investigate the concerns and did implement several recommendations to address the concerns. Birmingham Dep. at 76:11–77:11, 46:2–17.

The second set of events are those in August 2021, when Plaintiff contacted Birmingham to set up a meeting to discuss his concerns. SMF ¶ 119. While Birmingham did not meet with Plaintiff personally, Plaintiff was able to meet with her assistant, with HR Business Partner Margarita Buffel, and with Global Head of DEI Meeckel Beecher. *Id.* ¶¶ 123–27. Although Plaintiff was unsatisfied with these discussions, Plaintiff admits that he never followed up with Birmingham herself to arrange a meeting after August 4, 2021. *Id.* ¶ 128. In other words, Plaintiff has not shown that Birmingham was aware there were any continuing complaints to be addressed.

Based on this record, Plaintiff has failed to show any evidence of Birmingham's individual liability.

## 2. Garfield

Plaintiff argues that Heidi Garfield was likewise on notice of complaints of race discrimination and failed to act. Opp. at 12. However, Garfield testified that she took a number of actions to address DEI-related issues around the time of ASAT, including collaborating with Shutterstock's DEI team to engage employees and amplify diverse voices. Garfield Dep. at 60:18–64:23. Plaintiff offers no contradicting testimony and instead states that the sole basis for assuming that Garfield did nothing in response to his complaints was that he was not personally contacted regarding the complaints. Thompson Dep. at 232:9–16. Unfortunately for Plaintiff, a

"party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment[.]" *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation omitted).

Plaintiff also claims that Garfield made discriminatory statements about ASAT and ShADEs members as "angry" and "unproductive," among other things. *See* SMF ¶¶ 77, 81. To avoid summary judgment, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). The only evidence that Garfield made these statements is Thompson's own inadmissible hearsay testimony that he heard these statements from Nobles, Wang, and Ethington. It is also unclear from Plaintiff's testimony whether the hearsay from Nobles and Wang was referring to comments Garfield made before or after the ASAT event. Thompson Dep. at 223:13–225:17.

Plaintiff nonetheless attempts to argue that the statements made fall under the party-opponent admission exception in Federal Rule of Evidence 801(d)(2)(D). *See* Opp. at 17. This exception allows for the admission of statements made by the opposing party's employee "where the record demonstrates (1) the existence of an agency relationship between the declarant and the employer, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency . . . . A declarant need only be an advisor or other significant participant in the decision-making process that is the subject matter of the statement." *Stinson v. Morningstar Credit Ratings, LLC*, No. 22-CV-6164 (JLR), 2024 WL 3848515, at *13 (S.D.N.Y. Aug. 16, 2024) (cleaned up); *see* Fed. R. Evid. 801(d)(2)(D). Plaintiff has not shown how any of the declarants reporting on Garfield's remarks—Nobles, Wang, or

Ethington—are "significant participants" in these alleged statements. To the contrary, it seems that these declarants were making disclosures in a purely personal capacity.

Plaintiff has not stated any other basis for the admissibility of Noble's statements about what Garfield said about ASAT, and nor can the Court identify a basis. Without these statements, the claims against Garfield do not survive summary judgment.

### 3. Graham

Plaintiff claims that Andre Graham was also aware of Plaintiff's race discrimination complaints and that Graham discriminated against him by asking why he was still at Shutterstock if things were not getting better. Opp. at 13–14. It appears undisputed that Graham was aware of Plaintiff's complaints, at least to some degree. *See* SMF ¶ 197; Thompson Dep. at 28:6–29:10; Graham Dep. at 82:22–83:2. But the record does not reflect that Graham either engaged in discrimination directly or was grossly negligent in his supervision of other employees. *Patterson*, 375 F.3d at 229.

First, Graham's question about why Plaintiff was still at Shutterstock if he was unhappy cannot establish race discrimination. Plaintiff's framing of the conversation leading to this comment does not suggest that the comment was necessarily related to race. *See* Thompson Dep. at 388:13–389:11. It appears a large portion of the conversation was about frustrations regarding remote work denial. *See id.* And within this conversation, Graham also confessed that he doubted his decision to work at Shutterstock. *Id.* at 389:4–11. Based on this framing, it seems that Graham may have been posing a genuine question in a personal conversation, or that he made a stray remark in light of Plaintiff's broad frustrations. Alone, this statement cannot be enough to show that Graham intended to discriminate on the basis of race.

Second, Graham's testimony reflects that he did attempt to address Plaintiff's complaints and was successful in at least one instance. *See* Graham Dep. at 83:3–85:13 (explaining that Graham would attempt to de-escalate conflicts between Plaintiff and other employees so that the employees could work together and was successful on some occasions). Although Plaintiff characterizes Graham's testimony as dismissing his complaints of a racially hostile work environment as "interpersonal issues" and "gripes," *see* SMF ¶ 200, such a characterization does not rise to gross negligence or direct participation in discrimination. *See Morrison v. United Parcel Serv., Inc.*, No. 17-CV-2885 (WHP), 2019 WL 109401, at *7 (S.D.N.Y. Jan. 4, 2019) ("A few uncorroborated stray remarks and [plaintiff's] own perceptions" are not sufficient to defeat summary judgment.). The claim against Graham does not survive.

## II.    Hostile Work Environment Race Discrimination Claims Are Dismissed

Plaintiff claims that Shutterstock subjected him to a racially hostile work environment in violation of Section 1981, the NYSHRL, and the NYCHRL.

Under Section 1981, a plaintiff must establish two elements to prove a racially hostile work environment. *Lamarr-Arruz v. CVS Pharmacy, Inc*., 271 F. Supp. 3d 646, 655 (S.D.N.Y. 2017). First, a plaintiff "must demonstrate that the harassment was sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." *Id.* (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Tolbert v. Smith*, 790 F.3d 427, 429 (2d Cir. 2015) (cleaned up). A single "extraordinarily severe" incident might also satisfy this element. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000). "[D]etermining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of

the circumstances." *Id.* (cleaned up). Second, "the plaintiff must show a specific basis for imputing the hostile work environment to the employer." *Lamarr-Arruz*, 271 F. Supp. 3d at 656.

Under the NYCHRL and NYSHRL,[2] "the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason." *Mihalik*, 715 F.3d at 110 n.8. That said, even under this more lenient standard, "petty slights or trivial inconveniences are not actionable." *Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 122–23 (S.D.N.Y. 2020) (cleaned up).

In the Court's prior order on the motion to dismiss, the Court noted that Plaintiff could not impute hostile work environment liability under federal or state law for certain acts. These include the incidents of hair touching, comments about Plaintiff's family origin, and comments regarding Black employees "congregating" during lunch. *See* MTD Op. at 45. The Court did allow Plaintiff to proceed on and amend the hostile work environment claim based on Shutterstock's refusal to remove blackface images and comments by Defendants Garfield and Graham. *See id.* at 45–46. But Plaintiff has failed to offer sufficient evidence in support of his allegations to move past the summary judgment stage.

First, the evidence regarding the blackface images does not show the existence of a hostile work environment under federal or state standards. Plaintiff alleges that he was "forced to view racially degrading and dehumanizing images on at least a weekly basis" when the social media team referred these images to him for review. SAC ¶ 99. During his deposition, Plaintiff indeed testified that he was exposed to several instances of inappropriate material. *See, e.g.,*

---

[2] *See supra* note 1. Because neither party argues that NYCHRL and NYSHRL claims should be analyzed under different standards from each other, *see* Mot. at 19–21; Opp. at 15, the Court will apply the more lenient NYCHRL standard to NYSHRL claims.

Thompson Dep. at 322:12–18. But Plaintiff admitted that he was voluntarily involved with providing his views on images offensive to the Black community. *Id.* at 340:10–342:7.

Plaintiff also provides by example that in April 2021, he viewed two images in Shutterstock's database featuring a white-appearing woman with her skin painted black, which were the subject of a customer complaint. *See* Thompson Dep. at 328:15–336:22. But Plaintiff fails to show that he was shown these images for a racially discriminatory or hostile purpose. To the contrary, his testimony indicates that Shutterstock showed him these images so that Shutterstock could understand, with Plaintiff's input, how to better communicate to the image contributor why the images were inappropriate. *See id.* Shutterstock employees engaged in several messages discussing the inappropriateness of these images. *See id.* Ultimately, both images were removed from the Shutterstock library for violating the Content Policy's prohibition on blackface. SMF ¶ 143.

Plaintiff separately states that he encountered two other offensive images: (i) "an image of a vintage postcard featuring ten Black children with the title 'Ten Little N*****s'"; and (ii) "an image of a white performer in blackface with prominent facial piercings labeled 'The Savage'" from the Ducasse D'Ath festival in Belgium. SMF ¶ 144. While indisputably offensive, both images are classified in Shutterstock's database as editorial content, or content that "document[s] actual real-life events." SMF ¶ 145. Plaintiff fails to show that these images were present for a discriminatory, as opposed to educational, purpose. Plaintiff's own testimony suggests that his concern with this content is that it lacked any trigger warnings. *See* Thompson Dep. at 350:12–21.

Altogether, Shutterstock's actions indicate a lack of discriminatory intent, and any racial hostility engendered by these images cannot be imputed to Shutterstock. *Mihalik*, 715 F.3d at 110 n.8; *Lamarr-Arruz*, 271 F. Supp. 3d at 656.

Second, as discussed *supra* in Section I(E), the statements by Garfield are inadmissible hearsay and cannot support Plaintiff's attempt to defeat summary judgment. And as discussed in that same section, the statements by Graham do not show that Plaintiff was treated less well or that they were made with discriminatory intent. Neither can support a hostile work environment claim.

Even taking all alleged incidents together, Plaintiff's hostile work environment claim cannot survive. And that is because Plaintiff has simply failed to put forth admissible evidence that Plaintiff was treated less well because of his race or subject to severe or pervasive hostile environment.

### III.    Retaliation Claims Against Shutterstock and Individual Defendants Are Dismissed

Plaintiff claims that Shutterstock, Graham, and Garfield retaliated against him for complaints of race discrimination in violation of Section 1981, the NYSHRL, and the NYCHRL. "To establish a *prima facie* claim of retaliation, a plaintiff must show: (i) he engaged in protected activity; (ii) the defendant was aware of that activity; (iii) he suffered a materially adverse action; and (iv) there was a causal connection between the protected activity and that adverse action." *Livingston v. City of New York*, 563 F. Supp. 3d 201, 245 (S.D.N.Y. 2021). The more lenient standard under the NYCHRL, however, does not require a material adverse act. *Id.* A plaintiff can instead prove a retaliation claim by demonstrating that "[he] took an action opposing [his] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Id.* (alterations in original) (citing *Mihalik,* 715 F.3d at 112). Even under this "less demanding standard," a plaintiff must

still establish a causal connection between his protected activity and the employer's subsequent action. *Id.* (citing *Hughes* v. *Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018)).

Plaintiff's basis for his retaliation claim is that Garfield made inflammatory comments in response to ASAT. As discussed in Section I(E)(2), statements about what Garfield said are inadmissible hearsay and cannot constitute the basis for Plaintiff to create a genuine issue of material fact. *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

Besides Garfield's statements, Plaintiff makes no other argument that he suffered retaliation. *See* Opp. at 17. Plaintiff did not lose any job responsibilities, suffer any demotion, or suffer any decrease in his salary as a result of his complaints or participation in ASAT. *See* Thompson Dep. at 201:3–15. Given the preceding analysis in Sections I–II, neither can the Court identify behavior from either Shutterstock or Graham that would constitute retaliation. Indeed, after the ASAT events, Plaintiff received a merit-based increase in his salary, was featured in its Company-wide "Principles Spotlight," and was promoted to the position of Manager, Contributor Servicing and Emerging Products in GCC. SMF ¶¶ 75, 99–100. Even assuming that Plaintiff suffered any adverse acts, there is simply no evidence that any acts taken by Shutterstock or Graham had a causal connection with his complaints of racial discrimination. Plaintiff's retaliation claims do not survive summary judgment.

## IV.    Aiding and Abetting Claims Against Individual Defendants Are Dismissed

Plaintiff brings claims against Graham, Garfield, and Birmingham for aiding and abetting discrimination and retaliation in violation of the NYSHRL and NYCHRL. Because the Court has found there was no discrimination or retaliation to aid or abet, these claims necessarily fail. *See Griffin v. Sirva, Inc.*, 291 F. Supp. 3d 245, 254 (E.D.N.Y. 2018) (collecting cases).

## CONCLUSION

For these reasons, Defendants' motion for summary judgment is GRANTED. Plaintiff's

claims are DISMISSED with prejudice. The Clerk of Court is directed to TERMINATE all

outstanding ECFs and to CLOSE the case.

Dated:  September 24, 2025
        New York, New York

                                    SO ORDERED.

                                    _Jessica Clarke_
                                    _____

                                    JESSICA G. L. CLARKE
                                    United States District Judge